CESAR ACOSTA,

       Plaintiff,

   v.

CITY OF CHICAGO, et al.,

       Defendants.

No. 15 CV 8333

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Cesar Acosta, high on cocaine and marijuana, and with a blood alcohol content nearly three times the legal limit, caused a car accident. He was treated for minor injuries at the hospital and discharged under sedation. About an hour after police officers booked him into the police station lockup, Acosta had a fractured jaw and lacerations on his face and head. His memory of his time in custody is limited, but these wounds were self-inflicted. Acosta brings this action against certain present or former employees of the Chicago Police Department, defendants Mark Timmel, Michele Wilkoszewski, John Ward, David Widmann, and Wilson Fantauzzi, as well as the City of Chicago, for their roles in either causing or exacerbating Acosta's injuries. Defendants move for summary judgment on Acosta's claims. For the following reasons, that motion is granted in part and denied in part.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018).

## II.   Facts

Acosta, under the influence of drugs and alcohol, caused an accident involving two other cars. [91] ¶¶ 5–6.[1] He was charged, in relevant part, with driving under the influence and drug possession. [92-11] at 1. An ambulance took him from the scene of the accident to the hospital for medical treatment. [91] ¶ 7. Acosta's blood alcohol level was almost three times the legal limit and his toxicology test was positive for cocaine and marijuana; the hospital staff placed him in soft restraints during his stay. *Id.* ¶¶ 9, 11–12. After several hours of treatment, the hospital staff discharged him; at that time, he was sedated and calm. *Id.* ¶¶ 14, 16.

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings. In addition to the page number from the CM/ECF header, citations to depositions included in [83-1] also include the page and line numbers from the deposition transcript. The facts are largely taken from plaintiff's response to defendants' Local Rule 56.1(a) statements, [91], and the defendants' responses to plaintiff's Local Rule 56.1(a) statement, [102], where both the asserted fact and the opposing party's response are set forth in one document. When the parties raised arguments in their statements, included additional facts in their responses or replies, failed to support their statements by admissible evidence, or failed to cite to supporting material in the record, I disregarded those portions of those statements, responses, or replies. *See* LR 56.1(b)(3)(C) (facts are deemed admitted if not properly controverted).

Officer Wilkoszewski watched officers escort him from the hospital into the back of the police transport van—Acosta was handcuffed and he walked slowly and quietly. [92-19] at 45:2–46:12. The police transported Acosta from the hospital to the police station in that van.[2] [91] ¶ 17. All Acosta remembers of the transport was being in a wheelchair and not speaking to the police officers. *Id.* ¶ 21; [83-1] at 27, 120:14–22. Acosta does not remember getting out of the transport van or walking into the police station. [91] ¶ 22; [83-1] at 26, 85:7–21; *id.* at 27–28, 120:20–121:9.

Acosta's theory of his case is that he harmed himself during the transport (and again when he was in a police cell).[3] He asserts as a fact that he banged his head against the metal cage in the transport van, *see* [102] ¶ 3; to support that factual assertion, he cites the Case Incident Report, in which Officer White (who is no longer a party opponent in this case) wrote: "during the transport by CPD to 016 station above began banging his head against the metal cage," *see* [92-8] at 2. Narratives in such reports may contain inadmissible hearsay. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). In fact, when White was asked about

---

[2] Defendants say that Officer Josephine Christopher transported Acosta to the station, but she does not have an independent recollection of that evening, nor does she ever remember transporting an arrestee who banged his head against the metal cage inside the van. [91] ¶ 18. Acosta objects to defendants' assertion that Christopher transported Acosta, because her inability to recognize a photo of Acosta or to remember that evening means that defendant's reliance on Christopher's deposition testimony violates Local Rule 56.1. *See id.* At least one other officer who worked that evening remembers Christopher working as one of the officers assigned to the transport van that carried Acosta from the hospital to the station. [92-19] at 45:3–23. Christopher is not a named defendant, and the identity of the transporting officer is not material to this motion, so the court need not weigh in on this dispute.

[3] But in his deposition, when asked what his response to the police officers' position that Acosta injured himself in custody, Acosta said: "I didn't injure myself. I'm going to break my jaw, break my ankle, run into the wall with my head, and punch something in my mouth and knock my teeth. Yeah, I do this every day. No, I didn't do it." [83-1] at 27, 118:15–23.

the source of the information for that sentence, he said that there was "chatter" going on between the officers while walking into the station and that "That's just the way I phrased it for the summary," but he could not remember which officers participated in that "chatter," nor could he remember who transported Acosta in the van that night. [92-7] at 39:12–41:5. Neither White nor any of the named defendants have personal knowledge as to whether Acosta banged his head in the van. It is undisputed that a CPD Evidence Technician took photos of blood stains in the van as part of her assignment investigating Acosta's injuries while he was in police custody. [102] ¶ 4. Other than the evidence that there were blood stains (of unknown size and placement) in the van, there are no admissible facts that indicate how Acosta was injured in the van, what part of the body was injured, or how extensive the injury was. Nevertheless, an inference can be drawn in Acosta's favor from the stains alone that he was injured during transport.

Officers Timmel and Wilkoszewski followed the transport van in a separate vehicle from the hospital to the police station; when they arrived at the station, Wilkoszewski saw officers take Acosta out of the van and assist him in walking from the van to the station. *Id.* ¶ 5; [92-19] at 47:2–48:20. At that time, Wilkoszewski observed that Acosta was handcuffed and that he walked slowly and quietly, with the help of the officers. [92-19] at 47:2–48:20. There is nothing in the record about what Timmel saw when Acosta exited the van; but in his interrogatory responses, Timmel says that sometime before Acosta was discharged from the hospital, he saw Acosta limping and stumbling, and he noticed that Acosta had bruising and cuts on

his face. [92-14] ¶ 16; *see also* [92-4][4]; [92-12] at 2. Additionally, Timmel said that "[o]n information and belief, [Acosta] made numerous general threats of violence during his transport, processing and while in lockup," [92-14] ¶ 21, but this is not admissible because it is not based on personal knowledge.

When the officers escorted Acosta into the station, though, Acosta was twisting, flailing, yelling, and threatening to kill people. [102] ¶ 7. Lockup keeper Widmann observed that Acosta was limping, not handcuffed, and wearing a hospital gown.[5] *Id.* ¶ 13; [92-2] at 23:23–24:22. Widmann had never seen someone who was as "out of his mind" as Acosta was; Widmann believed that Acosta was highly intoxicated and Widmann was surprised that Acosta was let out of the hospital in such a state. [102] ¶¶ 8–9. Widmann did not believe Acosta should have been in the lockup because Widmann was concerned that Acosta might harm himself. *Id.* ¶ 9. The officers who transported Acosta to the station did not tell Widmann that Acosta harmed himself in the van during the transport. [92-2] at 64:2–6.

Lockup keepers are required to conduct an intake questionnaire with each incoming detainee; the questionnaire asks whether the inmate is suicidal, depressed, sick, injured, or intoxicated, among other things. [102] ¶ 36. Answers to

---

[4] Acosta filed his medical records under seal. [92-4]. He is directed to file the records on the public docket (redacting personal identifying information, *see* Fed. R. Civ. P. 5.2, and irrelevant matters), so that the materials relevant to this decision are part of the public record.

[5] When asked about his interrogatory response regarding seeing bruises and cuts on Acosta's face upon entering the lockup, Widmann clarified that he only remembers seeing bruises on the leg, not on the face. [92-2] at 109:16–19

these questions help the lockup keepers determine the amount of observation an arrestee needs or if an arrestee needs to be transferred elsewhere. *Id.* When Acosta was in lockup, however, the lockup keepers never asked him such questions. *Id.* Instead, the officers immediately escorted him into a cell.[6] *Id.* ¶ 12; [92-2] at 30:16–31:3. After locking the cell door, Widmann watched Acosta walk around the cell, attempt to stand on a concrete bench, fall off of the bench, and continue walking around the cell. *Id.* at 31:1–3, 35:2–36:25. Widmann did not ask anyone to put handcuffs or leg irons on Acosta while he was in the cell, even though they were available, nor did he seek medical care for Acosta at that time. [102] ¶¶ 16, 37. Widmann watched Acosta for a few minutes, and then he returned to the front of the lockup to process another prisoner. *Id.* ¶ 16.

When lockup keeper Fantauzzi started his shift, Widmann told him that they had a combative arrestee in a cell, so they both needed to watch him.[7] [91] ¶ 28. At about 9:30 p.m., Widmann went back to check on Acosta again. [102] ¶ 17. About fifteen minutes later, Fantauzzi went back to the cell area to check on Acosta and the other prisoners. *Id.* ¶ 19. There was nothing that concerned Fantauzzi about his observation of Acosta in his cell at that time, [91] ¶ 33, but he did notice some stitches above Acosta's eyebrow and some dry blood above the stitches. [92-9] at 31:12–23. Soon thereafter, Widmann and Fantauzzi heard noise coming from the

---

[6] Officer Ward received a call (he does not remember who the caller was) to inform him that a combative arrestee was en route to the station. [83-1] at 48, 25:2–11. Ward relayed that message to the lockup. *Id.* at 48, 25:12–21.

[7] Lockup keepers, including Widmann and Fantauzzi, do a visual check every fifteen minutes on prisoners in the lockup. [91] ¶ 30.

cell area, and Widmann went to check on Acosta. [91] ¶ 34. When Widmann arrived at Acosta's cell, Acosta was banging his head against the door and the wall, causing his head to bleed; Acosta also pulled off his hospital gown and he smeared his blood on the wall. *Id.* ¶ 35. Widmann did not try to stop Acosta from hurting himself because Acosta was in such a state of rage that Widmann felt it was unsafe to open the cell door and interact with him. *Id.* ¶ 36. Widmann also did not ask Fantauzzi to come back to help. [102] ¶ 24. Instead, Widmann immediately called the front desk to have Sergeant Ward call an ambulance. [91] ¶ 35, [92-2] at 47:18–19. Within moments, Sergeant Ward appeared in the lockup with Acosta's attorney, Nicholas Kournetas.[8] [92-2] at 47:13–22; [83-1] at 85, 41:22–42:11. Then, Widmann, Fantauzzi, Ward, and Kournetas walked back to Acosta's cell. [83-1] at 85, 42:11–16.

Kournetas observed that Acosta was unresponsive, incoherent, and naked; he also saw blood on the cell wall and floor. [102] ¶ 33. Given that Acosta was not in a state that warranted release from the cell, Ward only permitted Kournetas to talk to Acosta through the cell door. *Id.* ¶ 32. The only memory Acosta has of his time at the station that night was this brief moment when he was "laying [sic] in a corner, naked, with a blanket," and he looked up and saw his attorney's face. [91] ¶ 22; [83-1] at 26, 85:7–21; *id.* at 27–28, 120:20–121:9. Unable to facilitate a productive attorney-client meeting, Ward escorted Kournetas out of the lockup and he called

---

[8] As Ward remembers it, at about the same time that Kournetas entered the station, Ward received a call from the lockup informing him that a prisoner had injured himself. [83-1] at 49, 26:4–30:22.

for an ambulance. [91] ¶ 40. Kournetas remembers telling an officer that the police should call the hospital because Acosta needed medical attention. [92-6] at 30:15–19. He does not remember what the officer said in response.[9] *Id.* at 30:20–31:4. Fantauzzi did not open the door to try and render aid to Acosta because he was under the impression that the ambulance was on the way, [91] ¶ 37, and Ward never directed Fantauzzi or Widmann to administer any sort of aid to Acosta. [102] ¶ 29.

The Chicago Fire Department dispatched an ambulance at 10:28 p.m., [91] ¶ 41; the ambulance arrived at the station at approximately 10:33 p.m. *Id.* ¶ 43. White also arrived at the station to escort Acosta to the hospital with the paramedics. [102] ¶ 38. Acosta was extremely combative with the paramedics, which limited their ability to assess and care for him. [91] ¶ 43. At approximately 10:41 p.m., the ambulance left the police station with Acosta, and less than ten minutes later, it arrived at the hospital. *Id.* ¶¶ 44–45. The hospital staff treated Acosta for the second time that evening; he was combative with them too, because he did not want to be there. *Id.* ¶ 45. During the second visit, Dr. Barrick began Acosta's treatment, but at some point during the hospitalization, Dr. Collier took over Acosta's treatment. [92-4] at 53:2–55:6. The diagnoses from the second visit included a closed fracture of an unspecified part of the ramus mandible, a facial

---

[9] In response to the question "Do you remember any of the lockup keepers or any of the staff in the lockup looking like frenzied, like they were in a rush to do something, or, you know, trying to get Mr. Acosta any medical assistance?" Kournetas answered in the negative, and in response to the follow-up question "Did they all seem pretty calm?" he answered in the affirmative. [92-6] at 39:12–19.

laceration, and a scalp laceration. *Id.* at 53:8–55:11. Dr. Collier did not see any reference to a facial or scalp laceration in the notes concerning Acosta's first visit; but, Dr. Collier explained that the notes from the first visit did not refer to an observation of any trauma to Acosta's head, face, or neck—other than some abrasions around Acosta's mouth. *Id.* Once Acosta was released from police custody, he received treatment at Advocate Illinois Masonic where he received additional diagnoses of an ankle fracture and cranial facial fractures. [102] ¶ 40. Acosta has no memory of how these injuries occurred. [91] ¶ 46; [83-1] at 20, 49:10– 12.

Acosta dismissed certain counts and defendants from this action, [81] at 1; [90] at 25, and the following counts remain: Counts I and II are against defendants Timmel, Wilkoszewski, Ward, Widmann, and Fantauzzi for endangering Acosta while he was in custody, in violation of 42 U.S.C. § 1983; Count III is against these same officers for failing to provide medical attention in violation of § 1983; Count IV is against the officers for failing to intervene in violation of § 1983; Count V is against the City of Chicago for willful and wanton negligence (but the parties treat it as a claim against the individual defendants); Count IX is an indemnification claim against the City of Chicago; and Count X is a respondeat superior claim against the City of Chicago for state-law claims against the defendant officers. *See* [69].

## III.    Analysis

### A.    Counts I and II: Endangerment

Acosta argues that defendants violated his substantive due process rights by endangering him while he was in their custody. The due process clause does not provide an affirmative right to governmental aid; it aims to protect the people from the government, but it does not ensure that the government protects people from each other. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). When state actors increase a person's risk of harm without justification, they may violate the Constitution. *Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012).

In deciding whether a state actor has created or increased the danger to a person, courts must preserve the distinction between endangering and failing to protect—a state actor creates or increases danger when it turns a potential danger into an actual one; it does not create or increase danger by merely standing by and doing nothing to prevent private violence. *Vill. of Arlington Heights*, 782 F.3d at 917. To prevail on this claim, Acosta must show that each officer, by his or her affirmative acts, created or increased a danger Acosta faced; that each officer's failure to protect Acosta from that danger was the proximate cause of Acosta's injury; and that each officer's failure shocked the conscience. *Wilson-Trattner v. Campbell*, 863 F.3d 589, 593 (7th Cir. 2017). Only "rare and often egregious" circumstances warrant liability for a state actor creating or increasing danger for an individual. *Id.* (quoting *Vill. of Arlington Heights*, 782 F.3d at 917).

Acosta argues that defendants increased the danger when they allowed him to be brought into the station instead of returning him to the hospital. If defendants had simply returned him to the hospital, Acosta contends, he would have had access to medication, which would have prevented him from hurting himself again. The crux of Acosta's complaint is that defendants took the wrong affirmative step—they placed Acosta in the cell instead of taking him to the hospital. But, the inquiry is not "what dangers [the arrestee] would have faced had the [officers] behaved as he wanted them to, but what dangers [the arrestee] would have faced absent the affirmative acts actually taken." *Wallace v. Adkins*, 115 F.3d 427, 430 (7th Cir. 1997).

Timmel and Wilkoszewski were not involved in placing Acosta in a cell; they merely watched officers escort Acosta from the transport van to the station. To the extent that they allowed other officers to put Acosta in a cell, they cannot be held liable for such inaction. *Wilson-Trattner*, 863 F.3d at 595 (the Supreme Court held that inaction of state officials does not support a claim under the state-created danger doctrine). And although Ward received notice that the lockup was going to receive a combative arrestee (which is not synonymous with a self-harming arrestee), Ward only came into contact with Acosta after he had injured himself in the cell. Absent an affirmative act, Ward cannot be held liable for placing Acosta in a cell. Similarly, Fantauzzi began his shift after Acosta was already in the cell, so he did not affirmatively act to place Acosta in a cell, and cannot be liable on that basis. Widmann, however, took affirmative steps to place Acosta in a cell. But, as

Widmann argues, Acosta was already in a dangerous condition by virtue of being intoxicated, and Widmann did nothing to create or increase that danger. The same intoxication that placed Acosta in danger of harming himself before he was in the cell is what placed Acosta in danger of harming himself again once he was in the cell.

Acosta also argues that defendants created and increased the danger when they left him unsecured in a cell that was farthest from the lockup keepers, when they failed to properly monitor him, when they failed to stop him from hurting himself, when they failed to render aid to him, and when they failed to immediately summon medical aid for him. In effect, each of the issues is a complaint about defendants' indifference or inaction, which is insufficient to confer liability on any of the defendants. *Wilson-Trattner*, 863 F.3d at 595. By failing to do the things Acosta wished, defendants did not take affirmative steps to create or increase the danger that Acosta's intoxication and inclination to self-harm presented. Acosta has not carried his burden and his substantive due process claims in Counts I and II do not survive summary judgment.

## B. Count III: Failure to Provide Medical Attention

Police officers have a constitutional duty to provide adequate medical care to people in their custody. *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013) (quoting *West v. Atkins*, 487 U.S. 42, 55–56 (1988). The Fourth Amendment standard of objective reasonableness governs medical care claims brought by arrestees, like Acosta, who have not had a probable cause hearing. *Id.* at 629. (citing

*Ortiz v. City of Chi.*, 656 F.3d 523 (7th Cir. 2011); *Williams v. Rodriguez*, 509 F.3d 392 (7th Cir. 2007); *Sides v. City of Champaign*, 496 F.3d 820 (7th Cir. 2007); *Lopez v. City of Chi.*, 464 F.3d 711, 719 (7th Cir. 2006)).

The question here is whether defendants' conduct in denying or delaying Acosta's access to medical attention was objectively unreasonable, which in turn, involves an assessment of four factors: whether each defendant officer had notice of Acosta's medical needs; the seriousness of the medical need; the scope of the needed treatment; and law enforcement interests, including administrative, penological, or investigative concerns. *Ortiz*, 656 F.3d at 530. Acosta also must show that defendants' conduct caused the harm of which he complains. *Id.* Since defendants do not assert that the scope of the needed treatment—a return visit to the hospital— would have been too onerous, and because they do not assert that fulfilling that request would have compromised any police interests, the third and fourth factors are not at issue here. *Id.* That leaves notice, the seriousness of the medical need, and causation. Under the Fourth Amendment, the inquiry into seriousness operates on a sliding scale. *Id.* at 531. And in cases of delayed medical access, "the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (collecting cases analyzing delayed treatment under the Eighth Amendment).

Defendants argue that there is no evidence that they were on notice of Acosta's serious need of medical care until he began banging his head on the cell door and wall, and they promptly summoned medical assistance after that. *See*

*Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 601 (7th Cir. 2011); *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010). Defendants also assert that Acosta caused harm to himself and that he cannot show that defendants caused his injuries. This is especially true as to Timmel, Wilkoszewski, and Ward, defendants note, because those officers were not in the lockup when Acosta began banging his head. Each officer who encountered Acosta while he was in custody was obligated to reasonably respond to Acosta's medical complaints. *See Ortiz*, 656 F.3d at 531. Although defendants seem to limit their arguments to what officers knew and did once Acosta was already in the lockup, Acosta complains of injuring himself during the transport; therefore, the relevant time period begins with the transport and ends with Acosta's readmission to the hospital. And, the question is whether each officer reasonably should have known that Acosta had a serious need for medical care—that knowledge can be based on the officer's personal observations or on what the officer learned from others. *Id.* Whether each officer knew what was wrong with Acosta is irrelevant. *Id.*

Timmel and Wilkoszewski, in a separate police vehicle, followed the transport van containing Acosta from the hospital to the police station. The record is silent as to whether they observed any injuries when Acosta emerged from the transport van and walked to the station. The evidence of blood stains in the back of the van is evidence that Acosta sustained an injury during transport, but there is insufficient evidence from which the court can infer that Timmel and Wilkoszewski had notice of the injury. Even assuming that Acosta did suffer a serious injury during

transport, the record does not establish where Timmel and Wilkoszewski were in reference to Acosta when he emerged from the transport van and walked to the station; absent this evidence or related information, there is no inference to be drawn that it was obvious to Timmel and Wilkoszewski that Acosta was injured at all or that they were able to determine that Acosta was in serious need of medical care. Since Acosta did not establish that Timmel and Wilkoszewski were on notice that Acosta had a serious medical need after the transport, they cannot be held liable under the Fourth Amendment for allowing (watching) other officers escort him into the lockup. Timmel and Wilkoszewski are entitled to summary judgment on this claim.

Ward received a phone call warning him that a combative arrestee was due to arrive at the lockup, but the record does not show that Ward had any involvement with Acosta or with the officers who interacted with Acosta until after Acosta had injured himself in the cell. As such, there is nothing to support a finding that Ward knew Acosta was in serious need of medical care after the transport. Ward's involvement began when he learned that someone from the lockup called the front desk to call an ambulance for an arrestee. Ward cannot remember the precise timing of when he learned about the ambulance request in reference to when he began escorting Kournetas to see Acosta. Nevertheless, the first time Ward was on notice that Acosta was injured was after he escorted Kournetas to Acosta's cell and he saw Acosta lying on the cell floor, naked and bleeding. After it became clear that Kournetas could not have a meaningful attorney-client meeting with Acosta, Ward

escorted Kournetas out of the lockup and called an ambulance for Acosta. Though Acosta makes much of the fact that defendants stood at his cell and observed him for several minutes, causing a delay between the time he injured himself in his cell and when defendants called the ambulance, Acosta does not cite any authority for the proposition that such a delay was constitutionally deficient. And as defendants note, courts typically find an officer's conduct reasonable if he promptly summons medical assistance. *Florek*, 649 F.3d at 600–01. Since it is undisputed that Ward called the paramedics within minutes of learning that Acosta injured himself in the cell, he is not liable under the Fourth Amendment. This conclusion does not change even if Kournetas's request for an ambulance was the impetus behind the call— what matters is that Ward promptly summoned medical assistance. Ward is entitled to summary judgment on this claim.

Widmann entered the lockup with the officers who were escorting Acosta, and he helped those officers place Acosta in a cell. During this process, Widmann observed that Acosta needed the officers' help to walk and that he was limping badly. Widmann also noticed that Acosta was "out of his mind"—Acosta was screaming and yelling threats. Once in the cell, Widmann watched Acosta walk around the cell, continue to scream and yell threats, climb up on a concrete bench and fall off of it, and then continue walking around. Widmann's deposition testimony shows that he was concerned for Acosta's safety, but that he did not put handcuffs or leg irons on Acosta while he was in the cell (a potential safety precaution), and that he did not summon medical attention after he witnessed this

behavior. Once Widmann left Acosta in the cell, Widmann made sure that he or Fantauzzi checked on Acosta every fifteen minutes. At approximately the same time Widmann was on his way to check on Acosta, Widmann heard banging and he soon realized that Acosta was banging his head on the cell door and wall, causing it to bleed. Widmann immediately called the front desk to request an ambulance. Widmann never opened the cell door to stop Acosta from harming himself or to render aid to Acosta.

Acosta faults Widmann for repeatedly failing to summon medical assistance: Acosta asserts that Widmann should have called the paramedics before Acosta was put in a cell, when Widmann observed Acosta's limp and enraged behavior; then again when Widmann watched Acosta fall off of the concrete bench; and that Widmann should have called the paramedics directly and immediately after seeing Acosta hit his head in the cell. At summary judgment, a court cannot weigh evidence of Widmann's surprise that Acosta was discharged from the hospital and Widmann's concern for Acosta's safety, against evidence of Widmann's decision to rely on the reasoning of the hospital staff to release Acosta and Widmann's decision to leave Acosta unsecured in a cell, in order to make a conclusion about the reasonableness of Widmann's conduct. A jury could credit the first part of Widmann's testimony and could conclude that Widmann was aware that Acosta had a serious medical need for further hospitalization. But, a jury could also credit the latter part of Widmann's testimony and reason that Widmann might be aware of an injury and odd behavior, but that those things did not rise to the level of a serious

medical need. The question of whether it was unreasonable for Widmann to leave Acosta in the cell, under these circumstances, even with the intention of monitoring him frequently, is for a jury.

It is a "rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury." *See Ortiz*, 656 F.3d at 534–35. A jury could infer from the evidence that Acosta would not have sustained such severe injuries had Widmann acted to return Acosta to the hospital instead of leaving him in the cell. Consequently, Acosta has created a sufficient record to support an inference of causation here.

Widmann asserts that the doctrine of qualified immunity shields him from liability. But, qualified immunity does not protect state actors when their conduct violates clearly established constitutional rights. *Estate of Clark v. Walker*, 865 F.3d 544, 549–50 (7th Cir. 2017). "A right is clearly established when it is defined clearly enough to put officers on notice of their duties under the circumstances they confront." *Id.* at 551. Courts must define the right in question at the correct level of specificity. *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). But, that does not require a citation to a prior case that is directly on point; rather, qualified immunity does not apply when precedent places the constitutional question beyond debate. *Estate of Clark*, 865 F.3d at 551.

Here, the right is prompt access to medical care, and whether officers can deny or delay an arrestee's access to a hospital when faced with a serious need is beyond debate. *See Estate of Perry*, 872 F.3d 439, 459 (7th Cir. 2017) ("[Here,] the

jury could infer that although Perry ultimately died of a heart condition, it was the delay in providing *any* treatment that caused the harm."); *Ortiz*, 656 F.3d at 535 ("Here, a jury could infer, based on medical records and witness testimony, that the defendants caused Molina harm when they failed to take her to the hospital after they knew she suffered from a serious medical condition."). Specifically, it was clearly established in 2010 that the failure to take any action in light of a serious medical need would violate the objectively reasonable standard of the Fourth Amendment. *Estate of Perry*, 872 F.3d at 460. As such, Widmann was on notice that when an arrestee is in serious need of medical care, he must promptly summon medical support. Qualified immunity does not shield Widmann from liability here. Summary judgment is denied as to this aspect of Acosta's failure to provide medical care claim against Widmann.[10]

Fantauzzi, at the start of his shift, learned from Widmann that they had a combative arrestee in the lockup and that they would need to monitor that arrestee closely. Fifteen minutes after learning this, Fantauzzi checked on Acosta in his cell and did not observe any injuries or concerning behavior—he only saw dry blood above Acosta's stitches. It was only after Acosta injured himself in the cell and after he heard Widmann ask the front desk to call an ambulance that Fantauzzi saw

---

[10] It is worth noting, though, that the Constitution does not require officers to wrestle with violent arrestees or to administer aid to injured arrestees, *see Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); so Widmann is not liable for failing to stop Acosta from injuring himself or failing to administer aid to Acosta in the cell. And Acosta has pointed to no evidence that the several minutes that elapsed between when Widmann called the front desk to request an ambulance exacerbated Acosta's injuries or caused him additional harm. The claim that survives summary judgment is one based on the delay from Widmann's initial notice of Acosta's condition—a triable, albeit close, case when drawing inferences in Acosta's favor.

Acosta lying on the cell floor, naked and bleeding, at which point Fantauzzi realized Acosta was in need of serious medical attention. Fantauzzi said he did not call for an ambulance at that time because he was under the impression that one was already on its way. The record shows that within minutes of Fantauzzi's observation, an ambulance did arrive to the station. Whatever delay was caused by Fantauzzi's failure to call an ambulance immediately after seeing Acosta was in serious medical need did not cause the injuries of which Acosta complains. Summary judgment is granted as to this claim against Fantauzzi.

### C.     Count IV: Failure to Intervene

Defendants argue that they are not liable for failing to intervene because Acosta has not established the requisite underlying constitutional violation. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). In response, Acosta argues that because he established that defendants violated his constitutional rights, his failure to intervene claim should survive summary judgment. This is a superficial analysis by both sides. In any event, given my conclusion that Acosta has created a triable issue of fact only as to Widmann's conduct, and the absence of any evidence that any other named defendant had notice of or an opportunity to prevent Widmann's conduct, *see Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017), summary judgment is granted on the failure to intervene claim.

### D.     Count V: Willful and Wanton Negligence

A claim for willful and wanton negligence is a hybrid tort that exists between negligent and intentional torts, *Krivitskie v. Cramlett*, 301 Ill.App.3d 705, 707 (2d

Dist. 1998); it requires proof of a duty, a breach of that duty, and an injury proximately caused by that breach, *Kirwan v. Lincolnshire-Riverwoods Fire Prot. Dist.*, 349 Ill.App.3d 150, 155 (2d Dist. 2004). To establish that defendants engaged in intentionally willful and wanton conduct, Illinois law requires that Acosta show that defendants acted with actual or deliberate intent to harm. *Id.* Illinois law defines reckless willful and wanton conduct as conduct committed with "utter indifference" to or "conscious disregard" for the safety of others. *Id.*[11]

Acosta has not established that defendants owed him any duties beyond respecting his constitutional rights, and as to those duties, Acosta only successfully raised a triable issue of fact as to whether Widmann breached his duty to provide Acosta prompt medical care. Absent a finding that Timmel, Wilkoszewski, Fantauzzi, or Ward breached a duty they owed to Acosta, they cannot be held liable for willful and wanton negligence. Summary judgment is granted as to those defendants on this claim.

As for Widmann, Acosta has no evidence that Widmann acted with the intent to harm Acosta or with utter indifference to Acosta's safety. According to Acosta, Widmann was utterly indifferent to his safety because Widmann knew he injured himself in the van, but did nothing; and Widmann watched him bang his head in the cell and watched him lie on the floor of his cell injured and naked, but did nothing. Acosta also notes that defendants, including Widmann, failed to get Acosta's answers to a questionnaire that would have helped to determine Acosta's

---

[11] This claim is alleged only against the City of Chicago. [69] at 10. But the parties briefed it as if it was against the individual defendants, and the record is complete as to those issues.

security needs before putting him in a cell, and "if Acosta was unable to answer their questions due to his level of intoxication as they claim," they should have "transfer[red] him to a hospital or at the very least, check[ed] on him more often than every 15 minutes and put him in a cell closer to the lockup keeper desk so he could be more closely monitored." [90] at 22.

But the inference that Widmann knew Acosta was injured during the transport does not warrant an additional inference that he knew that Acosta was at risk of harming himself in the cell. Without more, Widmann's involvement in putting Acosta in a cell instead of returning him to the hospital does not show that he was utterly indifferent to Acosta's safety. The record shows that Widmann knew Acosta was limping and acting "out of his mind," but that Widmann intended to check on Acosta frequently. In other words, Widmann believed the situation could be managed. Widmann's failure to appreciate the risk of harm was possibly negligent (or in Fourth Amendment terms, objectively unreasonable), not something just short of an intentional tort.

Acosta's argument that Widmann did nothing when he saw Acosta banging his head in the cell ignores the undisputed fact that Widmann immediately called the front desk to request an ambulance. That Widmann did not call an ambulance himself, or that it took several minutes for the paramedics to arrive is not evidence of Widmann's utter indifference to Acosta's safety. Similarly, Widmann's inability to obtain Acosta's answers to the questionnaire and his subsequent decision to place

Acosta in a cell is not evidence of Widmann's utter indifference to Acosta's safety when placed in the undisputed context that Acosta was uncooperative.

Widmann is entitled to summary judgment on the willful and wanton conduct claim.

### E.    Counts IX and X: Indemnification and Respondeat Superior

Acosta's derivative claims for indemnification and respondeat superior against the City of Chicago rise and fall on his ability to establish that one of the officers was liable. *See* 745 ILCS 10/2-109 (a local public entity is not liable unless the act or omission of its employee caused the injury). The City may be required to indemnify Widmann if he is found liable for failing to provide medical access; but the respondeat superior claim is not viable because no state-law claim survived against an individual defendant. Summary judgment is denied as to indemnification, but granted on respondeat superior claim.

## IV.    Conclusion

Defendants' motion for summary judgment, [81], is granted in part and denied in part.


ENTER:

Manish S. Shah
United States District Judge

Date: July 31, 2018